IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THERESA TERRY,

                       Plaintiff,                            CV-06-1794-ST

          v.                                        OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner, Social
Security,

                       Defendant.

STEWART, Magistrate Judge:

## **<u>INTRODUCTION</u>**

      Plaintiff, Theresa Terry ("Terry"), seeks judicial review of the Social Security

Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act ("Act"), 42 USC §§ 401-33.  This court has jurisdiction

under 42 USC § 405(g).  All parties have consented to allow a Magistrate Judge to enter final

orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636©.  For the

reasons that follow the Commissioner's decision is AFFIRMED.

1 - OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Terry filed an application for DIB on September 19, 2001, alleging disability since August 10, 1990.  Tr. 111-13.[1]  Her application was denied initially and on reconsideration. Tr. 64-65.  Terry then requested a hearing before an Administrative Law Judge ("ALJ").  An ALJ conducted a hearing on May 20, 2004.  Tr 525-83.  At the hearing, after acknowledging that some of the documents in the record from the early and mid-1990s, just before her date last insured, did not support a finding of disability, Terry amended her disability onset date to June 27, 1996, corresponding to the date of an MRI taken at the behest of her then-treating physician, Frederick Cook, M.D.  Tr. 232, 529-30.  ALJ Jean Kingrey issued a decision on June 23, 2004, finding no severe impairment and therefore no disability at step two of the sequential evaluation process.  Tr. 66-77.

On August 6, 2004, the Appeals Council vacated the ALJ's decision and remanded the case back to the ALJ for reconsideration, finding that the ALJ had failed to state the weight given to various medical opinions, evaluate certain statements by lay witnesses, and sufficiently evaluate Terry's credibility.  Tr. 83.  The Appeals Council directed the ALJ to:  (1) give further consideration to the severity of Terry's impairments and consideration to the treating and examining source opinions pursuant to 20 CFR § 404.1527 and Social Security Rulings 96-2p and 96-5p; (2) explain the weight given to those opinions; (3) request further evidence or clarification of the opinions and medical source statements about what Terry could do as of her date last insured of September 30, 1996, pursuant to 20 CFR § 404.1512; and (4) further evaluate

---

[1] Although the ALJ's decisions indicate an application date of August 30, 2001 (Tr. 17, 69), the filing date appears to be September 19, 2001.  Tr. 111-13.

Terry's subjective complaints and evaluate her testimony regarding her symptoms in accordance with 20 CFR § 404.1529 and Social Security Ruling 96-7p.

On April 22, 2005, the ALJ and Terry's attorney met for a second hearing, but agreed that the ALJ simply needed to further evaluate the record in light of Terry's date last insured and without further testimony.  Tr. 584-89.  On July 29, 2005, the ALJ issued a second decision, again denying Terry's claim on the ground that she did not suffer from a severe impairment that significantly limited her ability to perform basic work activities through her date last insured on September 30, 1996.  Tr. 14-25.  On October 16, 2006, the Appeals Council declined Terry's request for review, making the ALJ's second decision the final decision of the Commissioner. 20 CFR §§ 404.981, 422.210.

## FACTUAL BACKGROUND

Born in 1957, Terry was 39 years old at the alleged onset of her disabilities and 47-48 years old at the time of the hearings before the ALJ.  Her past relevant work was as a psychiatric assistant, certified nursing assistant, security guard, and cannery worker.  Tr. 70, 148.

Terry originally alleged her onset of disability on August 10, 1990, which corresponds to the date of an on-the-job injury she suffered at Fairview Training Center where she had worked as a psychiatric assistant since 1984.  Tr. 146, 148, 531-32.  In her application for DIB, Terry alleged disability due to migraines, numbness in her hands and feet, and a ruptured disk in her neck and torn right shoulder and low back muscles which restricted her ability to lift.  Tr. 127. Following the August 1990 injury, Terry apparently suffered another on-the-job injury on November 13, 1990, resulting in persistent nonradicular pain.  Tr. 211, 316-17, 408.  At an initial appointment about a week after that injury, Richard C. Boughn, M.D., diagnosed strain of

cervical and lumbar spine "superimposed upon previously degenerative cervical spine disease," took Terry off of work, prescribed physical therapy, pain medications, and application of therapeutic heat, with a recheck in 7-10 days.  Tr. 316.

Due to the persistence of her symptoms after two weeks of physical therapy, Terry was referred to Salem Hospital's Industrial Medicine FAST (Functional Assessment Short Term) Program where she was evaluated by David R. Cooper, M.D., who diagnosed cervical and lumbosacral strain.  Tr. 297, 314-15, 318.  On December 12, 1990, Terry was exhibiting "frequent pain behaviors such as moaning, stiff and guarded movements, and verbal pain complaints."  Tr. 313.  For the next few months, Terry participated in physical (work conditioning) therapy, and by March 1991 was discharged from the FAST Program, "lifting at 75 lbs." and "ready to return to work."  Tr. 287, 297, 301, 303, 318.

On March 26, 1991, Terry was released to return to work under modified duties.  Tr. 286-87, 363.  At that time, her doctor restricted her from doing any crawling, repetitive bending, or lifting more than 20 pounds, and anticipated a restriction of three months.  Tr. 286, 288, 363. Terry remained working on modified duty at Fairview Training Center, apparently through the fall of 1991, when she began a job retraining program and GED program at Chemeketa Community College, earning a GED some time between 1993 and 1997.[2]  Tr. 194, 206, 531, 538.  In mid-1993, Terry apparently opted to receive a lump-sum payment rather than continue with job retraining.  Tr. 329.  Some time in late 1993 or early 1994, she began working in her husband's security business, where she continued working through at least June 1994.  Tr. 326-

---

[2]  Terry testified that she attended Chemeketa Community College between 1995 and 1997.  Tr. 531, 538.  However, the transcript from Chemeketa indcates that she attended between the fall of 1991 and winter 1993.  Tr. 185.

27.  During that time, in a letter addressed to the SAIF claims adjuster, F. William Miller, M.D.,

noted that Terry's "major medical problems" were "chronic pain accompanying her obesity and

poor physical conditioning."  Tr. 328 (January 11, 1994).[3]  A chart note from a visit with

Dr. Boughn on January 13, 1994, indicated that Terry was "basically doing very well," was "able

to continue to assist her husband in his security business," was "not limited at this time by pain,"

and "had some mild low back discomfort for the last week's time," for which Dr. Boughn

advised her to take "Tylenol only."  Tr. 327.

On May 29, 1996, Terry was seen by Dr. Cook for "verification of her ongoing

disability."  Tr. 425.  Dr. Cook noted his "quandary of not really having objective information of

her disability other than the previous information from MRI scanning" and suggested a review of

Terry's case, including a neurosurgical consultation and management of her chronic pain with

rehabilitation.  *Id.*

On July 19, 1996, Terry reported to Dr. Nelson that she had experienced no improvement

since her disability case was closed in 1991 and identified right shoulder pain and headaches as

her primary complaint.  Tr. 277.  At that time, she reported "no specific complaints of weakness

or numbness" (*id*), was "able to get around adequately to manage her household" (Tr. 278), and

was frequently traveling to California and "on and off" traveling to Reno (*id*).  Dr. Nelson noted

that although Terry had "marked truncal obesity and looks deconditioned in general," she looked

"completely comfortable and moves fluidly throughout the evaluation and the entrance to the

examination."  Tr. 279.  In addition, although Dr. Nelson noted some limitation in Terry's range

---

[3] This letter was apparently written in response to an inquiry by SAIF as to Terry's status.  A response to a SAIF inquiry from Dr. Boughn, Terry's treating doctor, was apparently misfiled in another patient's chart.  Dr. Miller, who was not Terry's treating doctor, was the Associate Medical Director of the Sisters of Providence Health Plan and was merely responding to a follow-up inquiry as to why SAIF had not heard from Dr. Boughn.  Tr. 328.

of motion, he also found "normal strength in all muscle groups tested." *Id.*  Dr. Nelson

diagnosed:  (1) chronic neck pain with a "[s]ignificant component of deconditioning;" (2) severe

volitional deconditioning; (3) probable borderline diabetes; (4) poor compliance with, and

therefore poor response to, therapeutic and exercise regimens; (5) tobacco abuse; and

(6) significant secondary gain factors from disability.  Tr. 280.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of no less than 12

months[.]"  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to

establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*,

517 US 1122 (1996) (citations omitted).  The ALJ engages in a five-step sequential inquiry to

determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 404.1520.

Below is a summary of the five steps, which also are described in *Tackett v. Apfel*, 180 F3d

1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial

gainful activity.  20 CFR § 404.1520(b).  If so, then the claimant is not disabled.

At step two, the Commissioner determines whether the claimant has "a severe medically

determinable physical or mental impairment."  20 CFR § 404.1520©).  If not, then the claimant

is not disabled.

At step three, the Commissioner determines whether the severe impairment "meets or equals" one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). 20 CFR § 404.1520(d). If so, then the claimant is disabled.

If the analysis proceeds beyond step three, the Commissioner must determine the claimant's residual functional capacity ("RFC"). The RFC is an assessment of work-related activities the claimant can perform on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR § 404.1545(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

Using the RFC, the Commissioner determines at step four whether the claimant can perform past relevant work. 20 CFR § 404.1520(e). If so, then the claimant is not disabled.

Finally, at step five, the Commissioner determines whether the claimant is able to perform other work in the national economy. 20 CFR § 404.1520(f). If not, then the claimant is disabled.

At steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F3d at 1098. However, at step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. *Id.*

///

///

///

## ALJ'S FINDINGS

At step one, the ALJ found that Terry had not engaged in substantial gainful activity since June 27, 1996. Tr. 19. At step two, the ALJ found that "there is simply no medical

evidence that [Terry] has a 'severe' medically determinable impairment through expiration of her insured status." Tr. 21. In particular, the ALJ concluded that: (1) during the five years between 1991 and Terry's date last insured of September 30, 1996, her complaints of "episodically limited cervical motion and/or muscle spasm" were supported by "no substantiating neurologic or orthopedic abnormality" (Tr. 21); (2) her "soft tissue strains resolved by March 23, 1991" (Tr. 22); and (3) "her obesity imposed no work-related impairments" (*id*). Accordingly, the ALJ concluded that Terry had "no medically determinable 'severe' impairment that significantly limits her ability to perform basic work-related activities through September 30, 1996." Tr. 25 (Finding 3).

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Bayliss v. Barnhart*, 427 F3d 1211, 1214 n1 (9th Cir 2005) (internal quotation marks and citation omitted). "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Orn v. Astrue*, 495 F3d 625, 630 (9th Cir 2007), quoting *Burch v. Barnhart*, 400 F3d 676, 679 (9th Cir 2005). This court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id,* citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v.*

*Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Batson*, 359 F3d at 1193.

## FINDINGS

Terry challenges the Commissioner's decision on the ground that the ALJ failed to properly consider her obesity, improperly rejected lay witness testimony, and failed to fully develop the record.

## I. Obesity

Terry contends that the ALJ failed to adequately address her obesity by failing to explain what limitations it causes and how it affects her other impairments, in violation of Social Security Ruling 02-01p, 2000 WL 628049 (September 12, 2002). The ALJ made the following findings with respect to Terry's obesity:

> While the medical evidence shows that the claimant is obese, as various physicians diagnosed, none imposed any work-related limitations relating to this. In this regard, given her height of 63 inches and weight between 213 and 227 pounds, . . . her body mass index (BMI) was at least 37.0, which is above the obesity-threshold-BMI. However, no physician identified her to have a co-morbid impairment. For example, while there is evidence of non-insulin diabetes mellitus and fatty cirrhosis, the claimant's glucose levels remained stable through expiration of her insured status. Likewise, her liver functioning values have been normal . . . . Nor does she have hypertension or any evidence of heart disease . . . . While physicians repeatedly told her to lose weight and exercise, they directed no other obesity-related treatment.

Tr. 22.

The ALJ then concluded that the medical evidence "does not document through expiration of the claimant's insured status the existence of a medically determinable 'severe'

impairment because her soft tissue strains resolved by March 23, 1991 . . . and her obesity imposed no work-related limitations."  Tr. 22.

In support of her argument that her obesity, either alone or in combination with her other impairments is a "severe" impairment, Terry cites chart notes from treating doctors on June 7, 1991 (Dr. Mayhall, Tr. 398), January 11, 1994 (Dr. Miller, Tr. 328), and July 19, 1996 (Dr. Nelson, Tr. 278).  Those documents, as well as other documents in the record, reveal that Terry is 63 inches tall (5'3") and her weight has remained at about 215-225 pounds since at least December of 1990.  Tr. 314, 414.

In December 1990, Terry weighed 226 pounds.  Tr. 314.  On June 7, 1991, orthopedic surgeon William Mayhall, M.D., noted that Terry was "quite heavy with a weight of 227 pounds and a height of 63 inches" and opined that "[w]ith this type of lack of conditioning, even the lightest of activities may lead to subjective pain."  Tr. 398.  On January 11, 1994, Dr. Miller noted that Terry's medical problems are "chronic pain accompanying her obesity and poor physical conditioning."  Tr. 328.

However, the ALJ's observation that no doctor has imposed any work-related restrictions as a result of Terry's weight is accurate.  In fact, despite her weight, Terry continued to work at modified duty at Fairview Training Center, completed a GED, participated in a job retraining program, and then worked at her husband's home-based security business through at least June 1994.  Tr. 286, 288, 363, 400.[4]

---

[4]  At about that same time, SAIF apparently rated Terry as having some degree of a permanent partial disability and closed her SAIF file.  Tr. 277.  The Public Employees Retirement System ("PERS") apparently later rated Terry as having a complete disability.  Tr. 277-78.

As accurately noted by the ALJ, while medical providers have noted Terry's substantial weight and advised her to exercise, none have cited her weight as a severe limitation on her ability to work. An exhaustive review of the record reveals ample support for the Commissioner's conclusion that Terry's obesity imposed no work-related restrictions on Terry through her date last insured of September 30, 1996. The few places when obesity is noted in the record, it is usually a passing reference to Terry's weight and often accompanies another notation of normalcy. *See, e.g.*, Tr. 314-15 (December 7, 1990 FAST consultation noting "overweight with protuberant abdomen, assessing cervical and lubosacral strain, with goal of returning her to work) and 206 (April 10, 1992 neurological consultation noting that Terry is "a moderately obese woman who has a relaxed, nonchalant attitude [and] shows a normal gait and posture.") While chart notes reflect the medical providers' view that Terry would be well-advised to lose some weight, they do not tie her failure to do so to work-related restrictions. *See*, *e.g.*, Tr. 280-81 (July 19, 1996 chart entry noting "significant truncal obesity" and "severe" deconditioning and advising an "exercise regimen involving five to seven days a week of aerobic exercise, particularly in a water environment") and 268 (November 3, 1999 entry noting that "poor conditioning, obesity, detrimental effects of cigarette smoking, and advancing age" are contributing factors to Terry's symptoms). Most of the information in the record dates to the initial period in the early 1990s after Terry's injury at Fairview Training Center. Additional information covers the time period after Terry's date last insured. Terry's visits to her treating doctors between the newly-alleged onset date of June 27, 1996, and her date last insured of September 30, 1996, consist primarily of visits seeking "verification" of her "ongoing disability" (apparently for purposes of the payments she was receiving either from SAIF or PERS), but

nothing in the record between those dates supports the proposition that Terry's obesity imposes significant restrictions on her. In sum, the record supports the Commissioner's conclusion that Terry's obesity was not a severe impairment through her date last insured.

## II.  Rejection of Witness Testimony

Next, Terry contends that the Commissioner improperly rejected the information set forth in the written witness statements of Lynda Hills (Tr. 159-70), Jo An Coil (Tr. 189), Diana Davis (Tr. 188), and Elmer Terry (Tr. 190-91). In order to reject the testimony of a lay witness, the ALJ must "give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F3d 915, 919 (9th Cir 1993).

In rejecting the statements of Ms. Hills, Ms. Coil and Ms. Davis, the ALJ correctly noted that they relate either to the time period between late 1990 and early 1991 when Terry was initially off work due to her injury at Fairview Training Center or, in the case of Ms. Hills, to the period of time when her statement was prepared in November 2001. Tr. 23-24. The statements give little or no information concerning the relevant time period between the alleged onset date of June 27, 1996, and the date last insured of September 30, 1996, and, therefore, were properly rejected by the ALJ.

The ALJ also rejected the information provided by Terry's husband, Elmer Terry. Tr. 23, 190-91. Although Mr. Terry referenced the time frame at issue in this case, the ALJ found that he gave less than a full account of Terry's activities during that time, citing inconsistencies in the contemporaneous medical records. Tr. 23. This sort of inconsistency is a valid reason for rejecting lay testimony and also is amply supported by the record in this case.

## III.  Duty to Develop the Record

12 - OPINION AND ORDER

Finally, Terry contends that the ALJ did not comply with the duty to develop the record. The ALJ cited multiple medical sources, including the medical expert, that found either very mild or no objective medical evidence to support Terry's complaints. Tr. 19-22. Based on the fact that she is making a claim and contending that she experiences multiple symptoms and related problems, Terry speculates that there must be some underlying but as yet unidentified mental process which accounts for her symptoms. In addition, Terry notes that she has been prescribed antidepressants (Tr. 202), further supporting her contention that mental health issues should have been examined. These arguments must be rejected.

There is simply nothing in the record to support the notion that a mental disorder is at play. Claimant testimony concerning more debilitating physical symptoms which is not supported by objective findings does not automatically convert a disability case into one premised on psychological impairments. If that were the rule, then potentially every case involving rejection of a claimant's testimony regarding physical symptoms could result in a contention that mental limitations should have been examined. Furthermore, the record is abundantly clear that the reason that Terry was prescribed the antidepressant drug, Desipramine, was not for treatment of depression or any mental impairment, but for management of pain. Tr. 156, 182, 202, 258, 274 (Desipramine "in a class of drugs considered standard for the management of chronic pain"). The record uniformly relates to treatment for Terry's physical – not mental – impairments, and it was not error for the ALJ to rule on Terry's claim for benefits without delving into mental health issues.

## **ORDER**

The opinion of the Commissioner is AFFIRMED.

DATED this 7th day of July, 2008.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge